## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 22 2020, 11:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship, N.G., Minor Child,

S.B., Mother,

*Appellant-Respondent*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner*.

July 22, 2020

Court of Appeals Case No.
20A-JT-60

Appeal from the Delaware Circuit Court

The Honorable Kimberly Dowling, Judge

Trial Court Cause No.
18C02-1905-JT-110

**Brown, Judge.**

[1] S.B. ("Mother") appeals the involuntary termination of her parental rights to her child, N.G.[1] We affirm.

### Facts and Procedural History

[2] On May 26, 2017, the Indiana Department of Child Services ("DCS") filed a petition alleging N.G., who was born on November 11, 2009, was a child in need of services ("CHINS"), had been tardy to school on forty-eight occasions and absent fifteen days during the school year. It also alleged that Mother used illicit substances including, but not limited to, marijuana, amphetamine, and methamphetamine, appeared to have sores on her chin and her mouth and injection wounds on her arms on May 17, 2017, and used illicit substances while serving as the child's primary caregiver. The trial court issued an order following an initial hearing which indicated it had entered a denial on Mother's behalf and N.G. had been removed and was currently in relative care.[2]

[3] Orders issued for continued initial hearings held on July 3 and September 25, 2017, indicate that Mother failed to appear at the hearings and that the court entered default judgment against her on September 26, 2017. On November 6, 2017, the court issued an order noting the default judgment and adjudicated N.G. to be a CHINS. On January 22, 2018, Mother failed to appear for the dispositional hearing, and the court's February 6, 2018 order indicates it

---

[1] N.G.'s father consented to adoption of the child and does not participate in this appeal.

[2] The court's December 9, 2019 termination order found that N.G. was removed on or about May 25, 2017, and had been continuously placed with her paternal grandmother since that time.

ordered Mother, among other things, to: contact the DCS family case manager ("FCM") every week; allow the FCM or other service providers to make announced or unannounced visits to the home of the child and permit entrance to ensure the safety of the child and to make the child available to the FCM; keep all appointments with any service providers, DCS, or the CASA/GAL, and give advance notice and good cause for missed appointments; maintain suitable, safe and stable housing; secure and maintain a legal and stable source of income; not use, consume, manufacture, distribute or sell illegal controlled substances; and take prescription medications for which a valid and current prescription exists and in doses and frequencies specified in the prescription; not consume any alcohol; obey the law; complete a parenting assessment and successfully complete all recommendations; submit to random drug screens; and attend all scheduled visitations.

[4]     Following a May 13, 2019 hearing, the court changed the permanency plan to adoption.[3]  In May 2019, the State filed a petition for termination of Mother's parental rights as to N.G.  On August 15, 2019, and October 24, 2019, the court held a factfinding hearing at which it heard testimony from Mother, therapists for Mother and N.G., several family case managers, and a court appointed special advocate (the "CASA").  When asked whether there would be any problem if Mother and N.G. were reunited, family case manager Alexis Jones stated that

---

[3] The court's May 28, 2019 order also indicated that DCS had provided home-based care work services, substance abuse assessment and treatment, and drug screens, and that Mother had not complied with the case plan.

"there would be some concerns based on how much time there's been . . . in this case" and expressed her thought that Mother is a positive influence and relationship in N.G.'s life. Transcript Volume II at 94. The CASA testified that the sobriety Mother maintained while incarcerated and "now through the watchful eyes of the court while she is . . . on house arrest" was "going to be difficult to maintain" and that it was reasonable to expect any long-term recovery, was "gonna (sic) be um, still quite a long time in the making" and "not a sure thing," but "a maybe." *Id.* at 103. The CASA agreed with DCS's termination recommendation and asked the court to grant the petition to terminate Mother's rights.

[5] On December 9, 2019, the court issued its termination order, which found:

> 13. [FCM Ethan] Harriett [("FCM Harriett"), a Family Case Manager with DCS,] was assigned to the CHINS case from the end of May 2017 until the end of October of 2017.
>
> 14. Mother's substance use was the primary reason that the child was out of the home at the time FCM Harriett was assigned to the CHINS case.
>
> 15. The child's mother used illicit substances, including methamphetamine, every day from early 2017 until her incarceration in March of 2019.
>
> * * * * *
>
> 18. During the time FCM Harriett was assigned to the CHINS case, Mother did not complete a substance abuse assessment or participate in counseling, and Mother did not submit to substance use screens.

19. FCM Harriett attempted to contact Mother regularly throughout his management of the CHINS case in an attempt to engage her in services.

20. Mother inconsistently participated in visitation with the child while FCM Harriett was assigned to the CHINS case.

\* \* \* \* \*

22. Khalid Fazly ("FCM Fazly") was a Family Case Manager with DCS and was assigned to the CHINS case from October of 2017 until January 10, 2019.

23. During the time that FCM Fazly was assigned to the CHINS case, Mother's substance use remained the primary reason that the child remained placed outside of Mother's care.

24. After several unsuccessful attempts to contact Mother, FCM Fazly was finally able to meet with [M]other on November 21, 2017.

25. At that time, Mother refused to submit to a drug screen.

26. Referrals for home-based case work, substance abuse treatment and parenting assessments were active and in place at the time FCM Fazly was assigned to the CHINS case.

27. On November 21, 2017, FCM Fazly advised Mother of the court-ordered services and provided her with a copy of the most recent court order and with contact information for service providers.

28. Mother did not complete a substance abuse assessment, did not participate in any substance abuse treatment, and participated in only a single home-based case work session during the time FCM Fazly was assigned to the CHINS case.

29. Mother did not maintain consistent communication with DCS, and FCM Fazly often did not know Mother's whereabouts.

* * * * *

34. FCM [Gregory] Buchanan [("FCM Buchanan")] was assigned to the CHINS case from January of 2019 until the end of August of 2019.

35. At the time FCM Buchanan was assigned to the case, all of Mother's service referrals had been closed due to Mother's failure to participate in them.

36. Mother's substance abuse remained the primary issue that kept the child outside of Mother's care.

37. Additionally, Mother was incarcerated in White County, Indiana between March of 2019 and June of 2019.

38. Mother was convicted of burglary as a level 4 felony.

39. At the time FCM Buchanan was assigned to the CHINS case, there was not a known address nor a known phone number for Mother.

40. FCM Buchanan attempted to contact Mother using the numerous addresses and phone numbers that were in the CHINS case file.

41. FCM Buchanan received a text from [M]other on February 12, 2019.

42. FCM Buchanan immediately responded to that text offering to meet with Mother.

43. FCM Buchanan received another text from Mother on February 15, 2019.

44. FCM Buchanan again replied immediately offering to meet, but Mother did not respond.

45. FCM Buchanan continued to attempt to reach out to Mother during the month of February, without response.

46. In April of 2019, FCM Buchanan located Mother in the White County Jail after conducting an inmate search for her whereabouts.

47. FCM Buchanan met with [M]other in the White County Jail on May 2, 2019.

48. FCM Buchanan made no service referrals for [M]other until July of 2019 because either he was not in communication with her or she was incarcerated.

49. In July of 2019, FCM Buchanan made a referral for a substance abuse assessment for Mother.

50. The first setting of the Fact-Finding Hearing in this cause was August 15, 2019.

* * * * *

52. [Mandalyn] Castanon[, a therapist with Meridian Health Services Maternal Treatment Program,] completed Mother's substance abuse assessment at the beginning of August 2019.

53. Ms. Castanon recommended the Maternal Treatment Program for Mother to address her substance abuse.

54. The Maternal Treatment Program consists of both individual and group therapy.

55. Ms. Castanon leads the group therapy component of the Maternal Treatment Program.

56. The first part of group therapy consists of twenty-four (24) sessions which meet Monday, Wednesday and Friday.

57. The second part of group therapy consists of twenty-two (22) sessions.

58. Mother was eligible to attend group sessions beginning on the first Monday after her August substance abuse assessment.

59.  Mother did not attend group therapy sessions in either August or September of 2019.

60.  In October of 2019, Mother participated in two (2) sessions of the first part of group therapy.

61.  Ms. Castanon has attempted [to place] Mother in more group therapy.

* * * * *

63.  [Kenzie] Troxell[, a therapist with Meridian Health Services Maternal Treatment Program,] was assigned to provide individual therapy services to [M]other on August 13, 2019.

64.  Ms. Troxell attempted unsuccessfully to contact [M]other three times by telephone beginning on August 14, 2019.

65.  Ms. Troxell was unable to arrange an individual therapy session with [M]other until mid-September of 2019.

66.  At this first session, Ms. Troxell set a weekly therapy appointment with Mother.

67.  Mother failed to appear for the first Monday appointment with Ms. Troxell.

68.  Mother has participated in three (3) appointments with Ms. Troxell since her first session in mid-September of 2019.

69.  Ms. Troxell is still in the rapport-building stage with Mother and has yet to be able to work on any treatment goals.

70.  The January 22, 2018 Dispositional Order, the May 7, 2018 Order Approving Permanency Plan, the November 5, 2018 Order on Periodic Case Review and the May 13, 2019 Order Approving Permanency Plan each provided that Mother may resume supervised visitation with the child if she complied with services and provided negative drug screens.

71. Mother did not meet these requirements until August of 2019.

72. Mother visited the child on two occasions between October of 2017 and August of 2019.

73. On August 23, 2019, Mother visited with the child for the first time since 2017.

74. Mother submitted to a drug screen on August 23, 2019, which was positive for methamphetamine.

75. Since the beginning of September of 2019, Mother has visited with the child and has submitted clean drug screens.

76. Mother has recently obtained employment at a call center.

77. Mother resides with her father.

* * * * *

79. [Selena] McKibben[, a therapist with Centerstone,] has been providing therapy services to the child since August of 2017.

80. Treatment goals for the child include eliminating or lowering depressive symptoms, regulating and communicating emotions, and developing positive coping skills.

81. The child has made progress in treatment and is showing less depressive symptoms, communicating more effectively and demonstrating positive coping skills.

82. That the child needs a safe, stable, secure and permanent environment in order to thrive. [Mother] has not shown the inclination or the ability to provide the child with such an environment and has not demonstrated that she is able to provide a home free of abuse or neglect for the child. The court has considered Mother's recent engagement in services, negative drug screens, housing and employment . . . . Accordingly, evidence of Mother's criminal history, history of substance abuse, failure to provide support, failure to demonstrate stable housing or

employment and failure to visit with the child for nearly two years are all factors that support termination of Mother's parental rights.

Appellant's Appendix Volume II at 84-87. The court found there was a reasonable probability that the conditions that resulted in the child's removal and/or continued placement outside the home will not be remedied and that it is in the best interest of the child to terminate the Mother's parental rights.

## *Discussion*

[6] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-

child relationship. Ind. Code § 31-35-2-8(a). A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not a license to reweigh the evidence. *Id.* Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand and not set aside its findings or judgment unless clearly erroneous. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[7] Mother argues she has addressed and remedied the issues of substance abuse that were identified by DCS as the conditions which resulted in removal. She contends that she "began to realize what she was going to lose," was clean after she was released from jail, participates in random drug screens, has employment, participates in visitation, participates in the MTP program and

counseling at Meridian Health Services, and has maintained sobriety. Appellant's Brief at 14.

[8] In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's drug abuse, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress,

the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[9] To the extent Mother does not challenge certain findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[10] The record reveals that N.G. was removed the same day that DCS filed a petition alleging she had been tardy to school on forty-eight occasions and absent fifteen days during the school year and that Mother used marijuana, amphetamine, and methamphetamine and used illicit substances while serving as N.G.'s primary caregiver. Mother used illicit substances every day from early 2017 until her incarceration in March 2019 for burglary as a level 4 felony, and her August 23, 2019 drug screen was positive for methamphetamine. Although we observe Mother's recent efforts in attending and participating in group and individual therapy for substance abuse beginning in mid-September 2019, we note the trial court is given discretion in balancing her efforts at improvement prior to termination against the habitual patterns of her conduct and in determining that the evidence of Mother's prior history is the best predictor of her future behavior. *See K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1234 (Ind. 2013) ("Further, the trial court was within its discretion to 'disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts.'"). In light of the unchallenged findings and evidence set forth above and in the record, we cannot say the trial

court clearly erred in finding that a reasonable probability exists that the conditions resulting in N.G.'s removal or the reasons for placement outside Mother's care will not be remedied.

[11]  In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).  In so doing, the court must subordinate the interests of the parent to those of the child.  *Id.*  The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship.  *Id.*  Moreover, the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests.  *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.  The CASA testified that Mother's sobriety would be difficult to maintain and it was reasonable to expect long-term recovery, would be "still quite a long time in the making" and "not a sure thing."  Transcript Volume II at 103.  The CASA agreed with the termination recommendation and asked the court to grant DCS's petition to terminate Mother's rights.  Based on the testimony, as well as the totality of the evidence as set forth in the record and termination order, we conclude that clear and convincing evidence supports the trial court's determination that termination is in N.G.'s best interests.

[12]  Affirmed.

Najam, J., and Kirsch, J. concur.